## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JANE DOE 1,**
**JANE DOE 2, and**
**JANE DOE 3,**

       **Plaintiffs,**

**vs.**                    **Case No. _____**

**THE ESPANOLA PUBLIC SCHOOLS;**
**RUBY E. MONTOYA, in her individual capacity;**
**GARY F. GREGOR, in his individual capacity;**

       **Defendants.**

**<u>Jury Trial Requested</u>**

## <u>COMPLAINT FOR CIVIL RIGHTS VIOLATIONS,</u>
## <u>TITLE IX VIOLATIONS, NEGLIGENCE,</u>
## <u>AND OTHER TORTIOUS CONDUCT</u>

COME NOW Plaintiffs, by and through their counsel, Carolyn M. "Cammie" Nichols and Alicia C. Lopez of Rothstein Donatelli LLP, and bring the following causes of action pursuant to 42 U.S.C. § 1983, 20 U.S.C. § 1681, the Fourteenth Amendment of the United States Constitution, and the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1, *et seq.*:

### <u>PARTIES</u>

1.    Plaintiff Jane Doe 1 is a resident of Rio Arriba County, New Mexico.

2.    Plaintiff Jane Doe 3 is a resident of Rio Arriba County, New Mexico.

3.    Plaintiff Jane Doe 2 is a resident of Rio Arriba County, New Mexico.

4.    Defendant Espanola Public Schools (*hereinafter* EPS) is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA

1978, §§ 41-4-3(B) and (C), as amended.  Under NMSA 1978, § 22-5-4(E), Defendant EPS has the capacity to sue or be sued.  Defendant EPS is responsible for the administration of public schools within its geographic boundaries.  At all times material hereto, Defendant EPS received federal funding and financial assistance.  At times material hereto, Defendant EPS employed Defendants Montoya, and Gregor.  Plaintiff's claims pursuant to the New Mexico Tort Claims Act against Defendant EPS arise under NMSA 1978, § 41-4-6.  Under the New Mexico Tort Claims Act, Defendant EPS is vicariously liable for the acts and omissions of Defendant Montoya and Defendant Gregor.  At all times relevant, Defendant EPS was responsible for adopting and implementing the policies, customs, and practices of its employees and agents, including Defendants Montoya, and Gregor.  Defendant EPS is a political subdivision of the State of New Mexico and a "person" under 42 U.S.C. § 1983.

5.     Defendant Ruby E. Montoya (*hereinafter* Montoya) was, at times material hereto, employed by Defendant EPS as a principal at Fairview Elementary School.  She was the direct supervisor of Defendant Gregor during the time that he was employed at the Fairview Elementary School by Defendant EPS as a teacher. Upon information and belief, Defendant Montoya resides in Sandoval County, New Mexico.  At all times material hereto, Defendant Montoya was a public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3 (F), as amended.  Defendant Montoya acted in the course and scope of her duties as an EPS employee and under color of law.  She is sued in her individual capacity for purposes of Plaintiffs' claims brought under 42 U.S.C. § 1983.

6.     Defendant Gary F. Gregor (*hereinafter* Gregor) was, at times material hereto, employed by Defendant EPS as a teacher at Fairview Elementary School. Upon information and belief, Defendant Gregor resides in Rio Arriba County, New Mexico.  At all times material

2

hereto, Defendant Gregor was a public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3 (F), as amended.  Defendant Gregor acted in the course and scope of his duties as an EPS employee and under color of law.  He is sued in his individual capacity for purposes of Plaintiffs' claims brought under 42 U.S.C. § 1983.

7.     With respect to Plaintiffs' New Mexico Tort Claims Act claims, the acts and omissions complained of herein all constitute a basis for liability against Defendant EPS, within the scope of the waivers of immunity proscribed by the New Mexico Tort Claims Act, NMSA 1978 §§ 41-4-1, *et seq*.

## JURISDICTION AND VENUE

8.     Jurisdiction over the federal claims is proper under 28 U.S.C. §§ 1331 and 1343.  Supplemental jurisdiction over the state claims is proper under 28 U.S.C. § 1367 (a) because the state claims and the federal claims derive from the same common nucleus of operative fact.

9.     Venue is proper in New Mexico pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### THE CAREER AND PREDATION HISTORY OF DEFENDANT GREGOR

10.     Defendant Gregor began teaching elementary school children in Utah in the Fall of 1984.  He taught there continuously until the Spring of 1995, according to Utah's "Verification of Teaching Service."

11.     While in Utah, he taught classes of fourth graders, fifth graders, combined fourth and fifth graders, and combined fifth and sixth graders.  He taught at two different elementary schools over 11 years.

12.     In October of 1994, a concerned parent called law enforcement when her elementary school-aged daughter did not come home when expected and was missing for several hours.

13.     It was discovered that Defendant Gregor had kept the girl, and another elementary school-aged girl, in his classroom after the school day was over.

14.     Investigation disclosed that, while in Defendant Gregor's classroom with him, the girls popped popcorn, watched movies, listened to music, did gymnastics, played around, and that Defendant Gregor asked them about their brassiere sizes and their menstrual periods.

15.     The girls were alone in the classroom with Defendant Gregor for approximately four and one-half hours.

16.     The parents of both girls were reportedly upset "because there were rumors that Mr. Gregor had been accused of sexual abuse of a child in the past;" and "[b]oth sets of parents were afraid that Mr. Gregor was befriending their children in order to possibly victimize them in the future."

17.     Neither girl disclosed sexual touching, but it is unclear whether the girls were provided with an opportunity to discuss the case with a forensic interviewer or were just questioned by officers and parents.

18.     Defendant Gregor claimed "he just started talking to the girls and lost track of time."  He was told by the school that he could no longer have students in his classroom after hours.

19.     He was not charged criminally, but police reports were generated, and those police reports are available as public records upon request.

20.     The school reportedly claimed that "the allegations about having a similar complaint against him were untrue."

21.     Actually, in January of 1994, 10 months prior to the October 1994 incident, public records reveal that Defendant Gregor had, in fact, been accused of sexual misconduct with three of his female elementary school-aged students.

22.     One of the girls recounted that Defendant Gregor rubbed her buttocks, hugged her, kissed her, caressed her thigh, said he loved her, and told her he wanted to take her to Montana when she turned sixteen to marry her.

23.     Another girl recounted that Defendant Gregor rubbed her thigh on numerous occasions, kissed her thigh, and hugged her.

24.     One of the girls recounted that she could feel Defendant Gregor's penis harden when he sat her in his lap, and when he hugged her tight against him.

25.     In January of 1995, criminal charges were filed against Defendant Gregor for this sexual misconduct, namely two felony counts of aggravated sex abuse of a child and one misdemeanor count of lewdness involving a child.

26.     The day before the criminal trial was set to begin, a Utah District Court Judge dismissed the case, reportedly "not[ing] that even assuming the truthfulness of the allegations against [Defendant] Gregor, the conduct did not rise to the level of a criminal act."

27.     On May 17, 1996, Defendant Gregor was issued a letter of reprimand by the Utah Professional Practices Advisory Commission.  The letter states that the Commission "found no evidence of immoral conduct, but did conclude that [Defendant Gregor] ha[d] been guilty of exhibiting a lack of professional judgment in some of [his] teaching activities, which [he himself] recognized and verbalized before the hearing panel."

28.     From August of 1996 through May of 1997, Defendant Gregor worked as a special education teacher and an after-school tutor on a reservation in Montana, where, he claims, he "acted as principal/superintendent on numerous occasions in the absence of the school district's principal/superintendent."

29.     Public records indicate that Defendant Gregor disclosed to Defendant PED in March of 1998 that he was "terminated by the Davis County School District for what they considered insubordination, school policy was that after school activities with students was [sic] not allowed."

**DEFENDANT GREGOR'S EMPLOYMENT BY SANTA FE PUBLIC SCHOOLS (SFPS)**

30.     On July 1, 2001, Defendant Gregor obtained two teaching licenses in the state of New Mexico, one for Level 2, Elementary K-8, and another for Special Education, K-12.

31.     Public records indicate that Defendant Gregor applied for a job with SFPS in June of 1998.

32.     Public records indicate that Defendant Gregor was officially hired by SFPS in August of 2000.  Other public records indicate that Defendant Gregor may have been hired by SFPS as early as March of 1998.

33.     A simple background check by SFPS, including basic research of public records, presumably would have revealed the criminal charges and the true facts surrounding Defendant Gregor's leaving employment as a teacher in Utah.

34.     SFPS hired Defendant Gregor to teach the school children of the district with no apparent inquiry (at least no documented inquiry as per the public record obtained to date) into Defendant Gregor's criminal background and employment history in Utah.

35.    Defendant Gregor signed a Certified (Licensed) School Instructor Contract with SFPS in December of 2000 for the 2000-2001 school year.

36.    In the 2000-2001 school year, his first year as a classroom teacher for SFPS, Defendant Gregor taught sixth grade Special Education at Ortiz Middle School.

37.    Defendant Gregor received negative evaluations at Ortiz Middle School, and was not recommended for re-hire.

38.    Yet, Defendant Gregor signed a contract to teach for the Santa Fe Public Schools again, for the 2002-2003 school year, in September of 2002.

39.    Defendant Gregor was hired by Principal Vickie Sewing at Agua Fria Elementary in Santa Fe, and he began teaching the fourth grade there in August of 2001.

40.    Defendant Gregor received positive evaluations during his first year at Agua Fria Elementary.

41.    In June of 2003, Sewing gave Defendant Gregor a completely positive evaluation, rating him as meeting or exceeding expectations in every instance.

42.    On January 28, 2004, Aurelia Gonzales, Director of Education at the Museum of International Folk Art, notified Sewing, by telephone and email, that docents at the museum observed inappropriate behavior by Defendant Gregor with his students during a field trip to the museum on January 27, 2004.

43.    Docents observed and reported Defendant Gregor, while at the museum on the field trip with his students: "fondling girls," sitting with girls on his lap, and falling asleep with two of the girls sitting so close to him that he woke because they had to shift positions.

44.    Sewing spoke directly with the docents, verifying their observations.

45.     Sewing informed Diane Sparago, Chief Human Resources Officer for SFPS, and Defendant Gregor was placed on administrative leave by SFPS on February 3, 2004.

46.     Per Diane Sparago, Sewing and a staff member with Human Resources, Angela Montoya, began interviews of Defendant Gregor's students.

47.     The information relayed by the students during those interviews included: Defendant Gregor only gets mad at the boys in his class; he hugs the girls in his class 'all the time;' he sat some of the girls in his class on his lap; he tickled the girls, including tickling them on their 'stomachs,' and they would wiggle and laugh; he 'squished' the girls when he played basketball with them; he gave 'raspberries' to the kids when they were 'bad;' and he gave gifts to at least one girl in his class, including a 'heart with kisses and hugs.'

48.     No arrangements were made for forensic interviews of the students.  Based on the public records available, none of this information was reported to the Children Youth and Families Department (CYFD) or to law enforcement by Sewing or any other representative of SFPS.

49.     Despite the fact that Sewing herself found the described behavior to be cause for "serious concerns," and "believe[d] this may well be 'grooming' behavior on the part of Dr. Gregor," she apparently did not report any of these concerns to CYFD or to law enforcement, nor, apparently, did anyone else involved in or aware of this investigation make any report to CYFD or to law enforcement.

50.     SFPS (through Superintendent Dr. Gloria Rendon) decided to serve Defendant Gregor with a notice of discharge.

51.     Subsequent to this decision, the parents of Defendant Gregor's students were notified that Defendant Gregor would not be returning to the classroom.

52.     The parents of three of the children (including two of the girls who reportedly were the objects of much touching by Defendant Gregor) reportedly "had serious concerns for their children, for their education and for their safety and mental well-being."

53.     The parents of the two girls "were also concerned that perhaps there was more happening than their children had told [Sewing] or were telling [them]."

54.     Arrangements were made for sessions with the school counselor, and a referral was provided to private counseling for one of the girls, but the girls were still not referred for a professional forensic interview and still, apparently, no referral was made to CYFD or to law enforcement for further investigation.

55.     In March of 2004, a request was made to the Santa Fe Rape Crisis Center, not to conduct forensic interviews but to teach an instructional unit called "'Project Aware' to help students understand good touch/bad touch, and about boundaries and their bodies."

56.     On May 6, 2004, Helen Nakdimen of the Santa Fe Rape Crisis Center wrote a letter to Defendant Sewing describing what Defendant Gregor's students disclosed to her on April 13, 2004, and April 27, 2004, during the "Project Aware" presentations.  Specifically, she described the students revealing to her that:

    a.     Defendant Gregor would hold girls in his lap and tickle them, during which they felt his "boner," "his thing was sticking up," and it was "nasty!"

    b.     Defendant Gregor would make boys wait an hour before allowing them to go to the bathroom.

    c.     Defendant Gregor would threaten boys with permanent loss of recess and force them to give him their snacks.

> d.     Defendant Gregor preferred two little blonde girls in particular, and asked one of them to meet him alone in the classroom; when she brought a friend with her because she felt uncomfortable, he became angry with her.

> e.     Defendant Gregor would slam doors, throw papers off his desk, and verbally threaten his students.

> f.     Defendant Gregor said he was an acupuncturist, brought needles to class, used them on himself, dared his students to do it to themselves, and told them to call him "Dr. Gregor."

57.     An interview of a parent corroborated that Defendant Gregor had female students in his class sit on his lap, that he demonstrated some kind of injections for his class, and that he favored the girls (especially the two blonde girls) over the boys in his class.

58.     Still, apparently, none of this was reported to CYFD or to law enforcement by Sewing or SFPS, and none of the students were referred for a forensic interview.

59.     On February 26, 2004, SFPS reported, in writing, to the New Mexico Public Education Department (*hereinafter* PED), that an investigation corroborated inappropriate physical contact between Defendant Gregor and his female students.

60.     Defendant Gregor responded to the allegations, and included his response in a letter to the PED on April 8, 2004, prior to his decision to agree to resign.

61.     Based on the public records available, apparently at no time did Sewing, or any other employee of SFPS, report Defendant Gregor's alleged sexual abuse of minor students to CYFD or to law enforcement, contrary to statutory and common law obligations to report. NMSA 1978, § 32A-4-3(A) (2005); *State of New Mexico v. Strauch*, 2013 WL 5798553, *6, {19}.

62.     Upon learning of the information obtained by the Santa Fe Rape Crisis personnel, Defendant Gregor decided to forego a "due process discharge hearing," and instead "agreed to resign from his position with" SFPS.

63.     SFPS negotiated an agreement with Defendant Gregor.

64.     This agreement was executed by SFPS (through Superintendent Dr. Gloria Rendon) and Defendant Gregor on June 15, 2004.

65.     The agreement was entitled "Resignation and Full and Final Agreement and Release of All Claims," and it provided:

a.     Defendant Gregor would resign his employment with SFPS.

b.     Defendant Gregor would agree to withdraw his request for a hearing before the School Board of SFPS.

c.     Defendant Gregor would "not apply for nor accept employment by SFPS."

d.     Defendant Gregor released SFPS from any potential civil claims he might bring against it.

e.      "SFPS District will give a neutral reference to all persons who make inquiry as to Mr. Gregor's employment with the District which shall consist of the dates of employment, job titles, and rates of pay."

66.     SFPS, therefore, agreed with Defendant Gregor that if any other school district contacted SFPS about hiring Defendant Gregor as a teacher, SFPS would not provide that school district with any information about Defendant Gregor's sexual abuse of his students.

67.     A review by the Educators Ethics Bureau verified inappropriate sexual contact of minor students as well as sexual harassment of minor students, along with other ethical violations, by Defendant Gregor.

68.     Based on this review, the PED executed a formal written reprimand of Defendant Gregor on May 13, 2005, to be placed permanently in Defendant Gregor's licensure file with the PED.

69.     This formal reprimand documented the Educators Ethics Bureau's findings of sexual contact and sexual harassment by Defendant Gregor towards his students, along with other ethical violations.

70.     Information was posted on the NASDTEC Clearinghouse, providing information to potential employers that a "Public Reproval or Formal Reprimand" had been issued against Defendant Gregor; that Defendant Gregor would "retain [his] license/certificate in [New Mexico]; that the "action [was] based upon sexual misconduct that did not result in a criminal conviction;" and that "the action [was] based upon non-sex related acts or crimes committed against a child."

**DEFENDANT GREGOR'S EMPLOYMENT BY DEFENDANT EPS AND RELATIONSHIP WITH DEFENDANT MONTOYA**

71.     Public records indicate Defendant Gregor was hired by Defendant EPS on January 10, 2005, but he did not enter a classroom or begin teaching students until the following school year.

72.     During the 2005-2006 school year, Defendant Gregor taught at Mountain View Elementary School in Truchas, New Mexico, a school within Defendant EPS.

73.     In the middle of the school year, teachers reported that he had one of his third-grade students, a girl, sitting in his lap, and that she would stroke his cheek.  Other students in the class said he favored her.

74.     This was documented and reported to CYFD, which elected to take no action. It was not reported to law enforcement.  No forensic interview was conducted of the third-grade girl.

75.     Defendant Gregor left Mountain View Elementary for another school within Defendant EPS.

76.     Defendant Ruby Montoya was the principal at Fairview Elementary School in Espanola, where Defendant Gregor began teaching second grade in August of 2006.

77.     According to Defendant Montoya, she and her husband became friends with Defendant Gregor and his wife beginning in August of 2006.

78.     Defendant Montoya and her husband went to the home of Defendant Gregor and his wife for meals, and had Defendant Gregor and his wife over to their home for meals.

79.     Defendant Montoya's husband, Jimmy Montoya, and Defendant Gregor were in the same math and science master's degree program, and spent a great deal of time together

after school hours and on Saturdays, ostensibly studying in their homes or Defendant Gregor's classroom.

80.     Like Defendant Gregor, Jimmy Montoya was a schoolteacher with a history of sexual misconduct with students at multiple schools.

81.     Indeed, in August 1999, Jimmy Montoya's Elementary K-8 and Athletic Coach 7-12 licenses were suspended by the New Mexico Board of Education for one year.

82.     The suspensions were based on allegations of inappropriate touching of students by Mr. Montoya over a period of several years, including that:

  a. Two separate Socorro, NM Police Department incident reports identified Mr. Montoya as a "suspect" who inappropriately touched two different female elementary school students while working as a teacher at Zimmerly Elementary School, following which Mr. Montoya resigned from the Socorro School District;

  b. While serving as a teacher at Santa Rosa Middle School during the 1994-1994 school year, the principal of that school received complaints that Mr. Montoya inappropriately touched a 14-year-old female student, and inappropriately touched and made inappropriate remarks to four other students;

  c. While serving as a middle-school teacher and coach at the Anton Chico School during the 1997-1998 school year, the principal received complaints that Mr. Montoya "swiped two female students across their buttocks," ran his hand down another girl's back, and "that other female students were also complaining about his touching"; and that

d.    An internal investigation at Anton Chico subsequently concluded that Mr. Montoya "was engaging in a lot of touching of girls," who felt uncomfortable around him, following which Mr. Montoya was terminated.

83.    Following the reinstatement of his teacher's license, Jimmy Montoya resumed teaching, this time in EPS.  Allegations of sexual misconduct with students again followed.

84.    In 2012, Jimmy Montoya was indicted on nine counts of "criminal sexual contact with a minor (child under the age of 13)" and battery.  The charges related to Montoya's alleged molestation of nine female elementary school students over the 2011-2012 school year, while working as a bilingual schoolteacher at Sombrillo Elementary in EPS.

85.    Mr. Montoya eventually entered into a plea deal with prosecutors whereby Mr. Montoya pled no contest to six counts of misdemeanor battery and the "criminal sexual contact of a minor in the third degree (child under 13)" charges were dismissed.  Mr. Montoya received a sentence of three years' supervised probation and also agreed to make restitution to his victims on all charges, whether or not dismissed.

86.    EPS also settled at least five separate civil lawsuits brought by victims of Mr. Montoya.

87.    Mr. Montoya's teaching license was revoked in 2012, after he declined to challenge pending revocation proceedings against him, following the institution of criminal proceedings against him in connection with his alleged molestation of nine students at Sombrillo Elementary.

88.    According to Defendant Montoya, it never occurred to her, during the time she worked in the EPS school district with her husband, that he might continue to engage in the

type of behavior that resulted in his earlier suspension; and never occurred to her that her husband should not continue to teach elementary school girls.

89.   Defendant Montoya never discussed her husband's behavior with him, and never brought any concerns about his behavior to the attention of anyone at any of the school districts where she and her husband worked.

90.   Defendant Gregor describes, in an email to Jane Doe 1' Grandmother dated March 24, 2007, that "Our principal, Ruby Montoya, has been so wonderful to me.  I'm working on a Master's degree on teaching math and science…and her husband is my study partner.  She's going to be my wife's companion when her husband and I are studying."

91.   Jimmy Montoya and Defendant Gregor studied together in Defendant Gregor's classroom at Fairview Elementary, and when asked if they ever accessed internet pornography while studying together, Jimmy Montoya stated that they did not, because "[t]he school firewall would not allow it."

92.   In addition to studying together, the two socialized with one another as well.  As Defendant Gregor describes, in an email to Jane Doe 1' Grandmother dated April 6, 2007, "The principal is a good woman.  I'm frequently over to her house.  I became buddies with her husband last summer when we started the Master's program."

93.   Defendant Montoya has stated that she visited Defendant Gregor's classroom about every other week, in addition to conducting three yearly in-class evaluations, and occasionally visited his classroom to discipline students.

**DEFENDANT GREGOR'S SEXUAL ABUSE OF PLAINTIFF JANE DOE 1 AND DEFENDANT MONTOYA'S INVOLVEMENT**

94.      According to Defendant Montoya, an art teacher named "Ms. Lorraine" reported to her, during the 2006-2007 school year, that Defendant Gregor had a female student in his second-grade class sitting by him the entire time the other students were engaged in an art project, and that he would not let the little girl participate in the art activity.

95.      That art teacher was Lorraine Hyde, who worked for Fine Arts for Children and Teens, and through that organization taught art at Fairview Elementary School in Espanola.

96.      The student was Jane Doe 1.

97.      According to Ms. Hyde (who is the aforementioned "Ms. Lorraine"), she informed Defendant Montoya, in the Fall of 2006, that she had observed several things about Defendant Gregor's classroom and his conduct towards a female student which caused her great concern, including:

      a.      Defendant Gregor kept all the blinds in his classroom closed.

      b.      Defendant Gregor had a female student, Jane Doe 1, seated in a desk located next to him, hidden from view behind his desk, leg to leg, so close that her desk touched his chair.

      c.      Defendant Gregor challenged Ms. Hyde when she made a move to open the blinds.

      d.      When Ms. Hyde asked why Jane Doe 1 was sitting so close to him, Defendant Gregor responded that Jane Doe 1 was the President, so she was required to sit next to him.

e.      When Ms. Hyde gathered all the students near the blackboard to begin the art lesson, Defendant Gregor would not let Jane Doe 1 join the other children, stating that she "stays with me."

f.      Ms. Hyde protested that Jane Doe 1 needed to join the others to participate in the lesson, and eventually Defendant Gregor relented.

g.      Jane Doe 1 briefly joined the other students, then returned to her seat next to Defendant Gregor after the demonstration.

h.      The students then gathered around tables to work on art projects, and, again, Defendant Gregor refused to let Jane Doe 1 leave his side, stating "she can't do that she sits by me."

i.      Again, Ms. Hyde insisted, and Jane Doe 1 came out from behind Defendant Gregor's desk, but she seemed to be cowering and reluctant to do so.

j.      The other students seemed to be afraid for Jane Doe 1, and began explaining to Ms. Hyde that Jane Doe 1 had to stay behind the desk, next to Defendant Gregor, because she was the President.

k.      Jane Doe 1 sat down, but she sat down facing Defendant Gregor and put her feet up on her chair, with her knees bent.  She was wearing a dress.

l.      Defendant Gregor then came directly over to Jane Doe 1, put his body up against hers, and began speaking to her about what she was going to do.

m.      Observing sexualized behavior on the part of Jane Doe 1, and the possessive, sexual, and utterly inappropriate conduct of Defendant Gregor towards Jane Doe 1, Ms. Hyde tried to defuse the situation by moving Jane Doe 1 to a different part of the table.

n.  Defendant Gregor continued to stand near Jane Doe 1, repeatedly touching her, placing his hands on her arms and shoulders, as Jane Doe 1 behaved in a way that seemed unwell, and repeatedly showed Defendant Gregor her art work.

98.  According to Ms. Hyde, she reported all of these observations, immediately following her instruction in Defendant Gregor's classroom, to Defendant Montoya.

99.  According to Ms. Hyde, Defendant Montoya told her that she had previously "warned [Defendant Gregor] that if he kept closing the blinds and keeping that student's desk behind his that people would ask questions."

100.  Ms. Hyde was so disturbed by this and by what she observed that she told Defendant Montoya that Defendant Montoya needed to call law enforcement and the parents of Jane Doe 1 immediately.

101.  According to Defendant Montoya, she called her "supervisor" (who she believes was Superintendent Cockerham at the time) and they conducted an investigation, during which she issued a "letter of leave" to Defendant Gregor.

102.  According to Defendant Montoya, when Jane Doe 1 was questioned, she reported that she was "the president and she always sat there."

103.    Plaintiff Jane Doe 1 remembers being "elected" President of the class.

104.    As President, she sat on a chair with wheels, at Defendant Gregor's desk, and she had a drawer full of candy which she could access at any time during the school day.

105.    Her place was with Defendant Gregor, at his desk.

106.    Defendant Gregor put his hand on her thigh, repeatedly, every day after she became President, and throughout the rest of the year.

107.    Defendant Gregor would keep her in his classroom with him when the other children went to recess and to lunch.

108.    He would lock the door to the classroom when she was in there alone with him.

109.    They would sit together at his desk, and he would tell her that they were going to grade papers together.

110.    Defendant Gregor told her that if anyone came in the classroom while they were in there together, she should move her chair (on wheels) to the other side of the desk.

111.    Defendant Gregor sometimes told Jane Doe 1 "Let's take a quick nap" during recess and over the lunch hour.

112.    There was an area rug in the classroom that the students sat on when Defendant Gregor read to the class.

113.    The rug depicted the letters of the alphabet with corresponding images, such as the letter "A" matched up with a picture of an apple.

114.    During these "naps," Defendant Gregor would position Jane Doe 1 on the rug in front of him.

115.     He would lay her down on her side and position himself behind her, with his arm draped over her body.

116.     His pelvis would be up against her buttocks and upper thighs.

117.     Jane Doe 1 could feel him rubbing something hard, his erect penis, up against her buttocks and her upper thighs during these "naps."

118.     Defendant Gregor had her take these "naps" with him during recess and the lunch hour regularly during that school year, but not every day.

119.     Defendant Gregor gave Jane Doe 1 gifts, in addition to access to the drawer of candy, throughout that year, including a teddy bear, clothing, an MP3 player, a camcorder, jewelry, money, and a bicycle.

120.     Defendant Gregor placed Jane Doe 1 in his lap while they searched for the right bicycle for her on the computer.

121.     They found a bike, which Defendant Gregor ordered and had it shipped to a store, where Jane Doe 1 and her grandmother picked it up.

122.     According to Defendant Montoya, Jane Doe 1' parents "didn't believe anything of what [she] was saying because Dr. Gregor was their friend and they have invited him into their home."

123.     Defendant Gregor, had, in fact, ingratiated himself to the family of Jane Doe 1, frequently communicating with her grandmother, including by email.

124.     When Ms. Hyde raised her concerns, Defendant Gregor took steps to reassure Jane Doe 1' grandmother, telling her (in an email dated May 3, 2007), "I remember now what I was talking to Jazzy about when the art teacher thought I was holding her closer to me than she deemed appropriate for a teacher with a student….The reason I was holding Jazzy close to

21

me when I was talking to her was because I considered it a private conversation and I didn't want the class hearing it."

125. He succeeded in convincing Jane Doe 1' grandmother, and gratefully emailed to her the next day, May 4, 2007, thanking her for her support, and telling her, "The principal went 'to bat' for me.  She said I was a person of high moral character and she had absolutely no concerns about me."

126. Days later, however, Defendant Montoya went to his classroom, apparently because of concerns raised by another teacher, and found Defendant Gregor's door locked during the lunch hour.  Defendant Gregor describes the ensuing events to Jane Doe 1' grandmother in an email dated May 7, 2007, as follows:

> I'm going to try to explain what happened and if you don't want me around Jazzy anymore I perfectly understand.  The last time I was home was Thursday morning.  From Thursday morning until Monday morning I had worked 70 hours at jobs (which is not usual so I was obviously tired and not thinking as clearly as maybe I should have.)  Jazzy came in this morning a few minutes before the bell rang and showed me her eye.  She wanted to talk about her eye, but with class starting we didn't have a chance.  I felt it was important for her to talk to me and I figured recess would be the only time we would have.  I thought if I could talk to her for a few minutes and get her out the door it should be ok.  Well, obviously I was wrong.  The reason I keep my door locked at recess is because I've been having students coming in when they're not supposed to it [sic] and it can get annoying.  I was told that Jazzy's father was concerned that the door was locked, but I figured if she's going to be in my home I guess I didn't see the difference.  I like these times when Jazzy and I can sit together and talk (which we haven't had much time lately).  I asked her if she wanted me to come to her games and she assured me she did.  While we were talking there was a knock at my door.  There's always students knocking on my door, but I could tell this time it was an adult and I knew with my (bad) luck it was probably the Principal.  I thought if it was the Principal I was in big dutch (actually the word dutch means being in trouble with the boss) and to avoid getting in trouble I asked Jazzy to go stand by the back closet hoping I could get rid of my visitor.  (I would have been glad to go for a walk with Jazzy instead of having her in my room, but I figured I would get in trouble for that, too.)  It was obvious the Principal was looking for her so there was no use escaping the situation and I tried to do the best I could think of.  Unfortunately, I got Jazzy dragged in the

mess which I highly regret.  When the Principal called me into her office I told her how I believe with every fiber in my being that I'm supposed to be involved in this little girl's life.  Ruby Montoya and her husband have been my close personal friends for the last several months so she knows me, but despite that she is a professional and she won't let friendship interfere with work so she said she needed to investigate the situation.  She's also said she has no concerns concerning my character, but because of the complaint of the art teacher she had no choice.  I went home and went to bed.  Now, I'm going to tell you something that is sacred to me.  When I was laying in bed in that half awake/half asleep condition some beings seemed to have appeared above me, announced they were angels, and said every thing [sic] would be ok.  I know it sounds nutty that this could happen, but every time I think about it I get emotional (teary eyed).  The Principal called to tell me I'm going to get my hand slapped for being insubordinate, but that I had been cleared.  I jokingly took a big plastic baseball bat to her and said I deserved to be beaten with it.  The Principal has told me that you're not happy with the situation I put Jazzy in (I wish I had never kept her in, but I thought it was important to talk to her and I'm always trying to push the envelope), but I want you to know that the mistakes I made were mistakes of the heart.  The last thing I would ever want to do is hurt Jazzy.  I could tell by the way the Principal talked about meeting with Jazzy that she was really impressed with her and I said 'I told you she was a great girl.'  I won't come to her games if you think that's best.  I made a mistake and I'm willing to pay the consequences.

127.    In point of fact, Defendant Gregor made Jane Doe 1 hide from Defendant Montoya, who was indeed looking for Jane Doe 1 in his locked classroom, because of the concerns raised specifically about his conduct towards Jane Doe 1 and that he had a student alone with him in his locked classroom.  As the other students came in from recess, Defendant Montoya counted them and found there was one student missing, at which point Defendant Gregor instructed Jane Doe 1 to go out a different door in the class and to then pretend to come in through the door from the playground.  She did, and Defendant Montoya quickly realized who had been missing in the first count.  It is obvious from the email written by Defendant Gregor that Defendant Montoya realized that he had, in fact, had Jane Doe 1 alone with him in his locked classroom during the lunch hour.

128.    However, despite all of this, Jane Doe 1 was not sent for a forensic interview, and Defendant Montoya did not notify CYFD or law enforcement, nor did any other employee or agent of Defendant EPS notify CYFD or law enforcement.

129.    According to Defendant Montoya, she conferred with her supervisor and brought Defendant Gregor back to the school to resume teaching the day after she talked to the parents of the little girl.

130.    Defendant Montoya claims that she told Defendant Gregor "to please stop having presidents in that classroom," to "refrain himself from any children being around his desk," and "to allow the child to participate in any activities, being art or whatever."

131.    According to Defendant Montoya, "that was the extent of that one." Defendant Montoya never references the incident involving Defendant Gregor locking Jane Doe 1 in his classroom with him during any of her statements related to his career at her school.

132.    Defendant Gregor told Jane Doe 1' grandmother, in an email dated May 12, 2007, that Defendant Montoya treated him well after discovering him alone in his locked classroom with Jane Doe 1, stating, "The Principal has been real good to me about it because she knows me.  She is a first class professional."

133.    Defendant Montoya testified that Defendant Gregor stopped the behavior she *did* reference in her reports for the remainder of that school year, and "we didn't never have another problem in second grade with that."

134.    However, Dr. Fidel Trujillo testified that Defendant Montoya informed him "that after she gave [Defendant Gregor] a directive not to have the officers sitting next to him, for a period of time he complied, but that she then observed that he was back in the practice of having the officers sit up next to his table."

24

135.    When Ms. Hyde returned to Defendant Gregor's classroom the following week, she observed that the blinds were still closed; Jane Doe 1' desk was still next to Defendant Gregor's chair, behind his desk; and that the behaviors between Jane Doe 1 and Defendant Gregor were similar to the behaviors from her first experience in his classroom.

136.    Defendant Montoya then called Ms. Hyde into her office, with Defendant Gregor present, and told Ms. Hyde that she had informed Defendant Gregor about Ms. Hyde's concerns.

137.    Defendant Gregor then challenged Ms. Hyde, and told her that he was good friends with Jane Doe 1' parents, so Ms. Hyde had nothing to worry about.

138.    Ms. Hyde felt like she was in jeopardy, and she stated to both Defendant Gregor and Defendant Montoya that she wanted the police to be called, and that she wanted her report to Defendant Montoya to be documented and dated.

139.    No one from law enforcement or CYFD ever contacted Ms. Hyde.

140.    Ms. Hyde reported her concerns to her supervisor, Julia Bergen, the Executive Director (at that time) of Fine Arts for Children and Teens.

141.    Ms. Hyde informed Ms. Bergen that she feared Defendant Montoya would not take appropriate action concerning Defendant Gregor.

142.    Ms. Bergen then spoke directly to Defendant Montoya, and, based on that conversation, was also afraid Defendant Montoya would not act.

143.    Ms. Bergen contacted CYFD with her concerns, and the concerns expressed by Ms. Hyde, by calling and reporting those concerns to the CYFD Hotline.

144.    No one from law enforcement or CYFD ever contacted Ms. Bergen.

145.     Although the circumstances of their meeting are unclear, Superintendent Cockerham admits that he personally discussed Lorraine Hyde's allegations with Defendant Montoya.

146.     Superintendent Cockerham has testified that Defendant Montoya acted appropriately in conducting and resolving her own investigation into the allegations reported by Ms. Hyde without reporting those allegations to CYFD.

147.     According to Superintendent Cockerham, "[if] the blinds [in Defendant Gregor's classroom] were open" after his meeting with Defendant Montoya, then Defendant Montoya "has no further need to do anything beyond that time because [Defendant Gregor] took the direction to do what he needed to do."

148.     According to Superintendent Cockerham, Defendant Montoya had no duty to report Ms. Hyde's concerns about Defendant Gregor's bizarre behavior towards Jane Doe 1 unless the alleged misconduct "hit the threshold" of suspected child abuse in Defendant Montoya's "personal opinion," because perceptions of sexualized conduct towards schoolchildren are "very subjective."

149.     According to Superintendent Cockerham, the duty to report suspected child abuse is entirely within the discretion of the EPS employee who learns of the possible abuse.

150.     Superintendent Cockerham has testified that he did not even ask Defendant Montoya whether the report involving Jane Doe 1 met her threshold "of needing to contact the State," because he "felt that it was her responsibility to make that decision."

151.     Superintendent Cockerham acknowledges that he was made aware of Defendant Montoya's so-called investigation, and that he did nothing to follow up or investigate further

after the investigation was resolved by Defendant Montoya with no consequences for Defendant Gregor.

152.    Superintendent Cockerham admits that no report of Ms. Hyde's allegations regarding Defendant Gregor's behavior was made to the Public Education Department.

153.    After Defendant Gregor switched from teaching second grade to teaching fourth grade, he wanted Jane Doe 1 to be in his classroom.

154.    Jane Doe 1 was in the fourth grade during the 2008-2009 school year.

155.    Jane Doe 1 did not want to be in his classroom again, so her grandmother told Defendant Gregor that Jane Doe 1's parents were not comfortable with her being in his class.

156.    Defendant Gregor, according to him, had her placed in a different classroom.

157.    Defendant Gregor describes to Jane Doe 1's grandmother, in an email dated May 8, 2007, how "if [children] don't get good touch they're going to seek any type of touch because they need to be touched."

158.    Defendant Gregor had moved on from his predation of and obsession with Jane Doe 1 to predating upon and obsessing over various fourth-grade girls he taught during the 2007-2008 and 2008-2009 school years.

159.    He wrote in an email on September 8, 2007 to Jane Doe 1' grandmother, "When I first started teaching I felt that you had to reach girls before 6th grade if you wanted to hopefully have a positive lasting influence on their lives.  Now I believe conditions have changed so that it has to be before 5th grade (I'm talking in general terms, of

course)….[N]ow that I'm teaching 4th grade, even though the boys seem to like me it's only the girls that want to give me a hug or hold my hand when we're walking someplace."

### DEFENDANT GREGOR'S SEXUAL ABUSE OF STUDENTS DURING THE 2007-2008 SCHOOL YEAR, AND DEFENDANT MONTOYA'S INVOLVEMENT

160.    Defendant Gregor continued the practice of closing his blinds and seating female students next to him during and throughout the 2007-2008 school year, during which he taught fourth grade at Fairview Elementary School.

161.    Jennifer Chavez was an Educational Assistant who worked at Fairview Elementary School in Espanola contemporaneously with Defendant Gregor.

162.    During the 2007-2008 school year, she observed Defendant Gregor routinely sitting between two girls in the cafeteria, with his hands constantly underneath the table.

163.    KS, AL, and Nallely Hernandez were the three girls who he sat next to in the cafeteria, placing himself between two of them.

164.    Ms. Chavez also observed that Defendant Gregor would hold the hands of two of those same three girls as he traveled between the cafeteria and his classroom with his students.

165.    Ms. Chavez found this behavior disturbing and reported it to Defendant Montoya within a few days of observing the behavior.

166.    Defendant Montoya said she would talk to Defendant Gregor.

167.    Defendant Montoya claims that if Ms. Chavez reported to her that Defendant Gregor held the hands of female students walking to and from the cafeteria, or sat next to his

female students in the cafeteria with his hands constantly under the table, she has forgotten about that report.

168.    Defendant Montoya acknowledges she received "one complaint about [Defendant Gregor] always sitting on the side of the girls" when eating with his students in the cafeteria, and stated she "did ask him not to sit on the side of the girls so there wouldn't be any problem."

169.    While Defendant Montoya denies that Ms. Chavez reported to her that Defendant Gregor held the hands of female students while walking to and from the cafeteria, Defendant Montoya clarifies that she in fact knew that Defendant Gregor held the hands of female students walking to and from the cafeteria, based on her own observations.

170.    Defendant Montoya testified that she "told him to stop it, and he did."

171.    During the 2007-2008 school year, Ms. Chavez's daughter was a student in June Madrid's Fourth Grade class at Fairview Elementary.

172.    Ms. Madrid's students would go to Defendant Gregor's classroom for science lessons.

173.    Defendant Gregor's students would come to Ms. Madrid's classroom for Spanish lessons.

174.    One day, Ms. Chavez's daughter reported that Defendant Gregor told her "it's OK for an older man to marry a 12-year old girl," and that it was also acceptable for a man "to have more than one wife."

175.    Ms. Chavez in turn reported these statements by Defendant Gregor to Ms. Madrid.

176.    Ms. Madrid said she had "heard things too," and that she was going to inform Defendant Montoya that she was not going to exchange students with Defendant Gregor any longer.

177.    Ms. Chavez also reported these concerning comments to Defendant Montoya the day after her daughter told her about them.

178.    Defendant Montoya responded that she would talk to Defendant Gregor.

179.    Defendant Montoya acknowledges that Ms. Chavez came to her with a complaint about Defendant Gregor, but she claims that Ms. Chavez reported Defendant Gregor had told his class that, during war, "the women stayed behind to have babies."

180.    Ms. Madrid later reported to Ms. Chavez that Defendant Montoya stated the exchange of classes had to continue "because of bilingual."

181.    However, at some point that year, the exchange of students between Ms. Madrid and Defendant Gregor ceased.

182.    Ms. Chavez's daughter also reported to her mother that Defendant Gregor would throw unwrapped candy to the girls in class and tell them to "come sit by me."

183.    Ms. Chavez reported this concerning behavior to Defendant Montoya.

184.    Defendant Montoya responded that she would talk to Defendant Gregor.

185.    Sometime after Ms. Chavez expressed her concerns to Defendant Montoya, Defendant Gregor stopped speaking to Ms. Chavez.

186.    This was approximately two months or so prior to school personnel engaging in preparations for the winter break during the 2007-2008 school year.

187.    According to Ms. Chavez, Defendant Montoya was not responsive to the concerns she expressed about Defendant Gregor.

188.    There is no record of Defendant Montoya taking any action whatsoever with respect to this information, except, perhaps, discussing the matter with Defendant Gregor.

189.    Defendant Montoya apparently never reported any of these concerns to CYFD or to law enforcement, contrary to her obligation to do so.

190.    During the 2007-2008 school year, Defendant Gregor victimized several girls in his fourth-grade class, including Nallely Hernandez, Ana Loya, and Kathlynn Salazar.

191.    During the first month of the 2007-2008 school year, Defendant Gregor began touching Nallely Hernandez (described as Student A during the PED hearing).

192.    Ms. Hernandez told her friends about it, and several of them said "he did the same thing to them."

193.    Defendant Gregor gave Ms. Hernandez lots of candy, teddy bears, and art sets, and he gave candy, teddy bears and art sets to the other "council" members, too.

194.    Defendant Gregor told Ms. Hernandez to stay in the classroom after the bell rang, and kept her there, alone with him.  He asked her to go into the closet with him.  He said he wanted to kiss her.

195.    Knowing she was in there alone with him, her friends would wait for her outside of the classroom door.

196.    When Defendant Gregor touched Ms. Hernandez he told her not to tell anybody, or else.  He said he knew her family, and where she lived.  His threats scared her.

197.    When Ms. Hernandez wore skirts, Defendant Gregor would touch her on her inner thighs and, eventually, her vagina.

198.    She stopped wearing skirts, but Defendant Gregor would put his hands inside her pants, pushing down under her belt, in order to fondle her.

199.   Ms. Hernandez saw him do these things to her friends as well.

200.   Ms. Hernandez and three of her friends went to Defendant Montoya during the school year to report to her that Defendant Gregor was touching their legs in a way that made them uncomfortable.

201.   Ms. Hernandez considered her legs, especially her inner thighs, to be 'private parts,' and the girls agreed before they went to report to Defendant Montoya that they would use the word "legs."

202.   Defendant Montoya told the girls, in response, that she knew Defendant Gregor very well, that he was a good friend of hers, and that she knew he would not do that.

203.   Soon after Plaintiff and her friends reported the touching to Defendant Montoya, Defendant Montoya came to their classroom and told Defendant Gregor that she wanted to speak to his class.  She then told the four girls who came to her office, along with all of their classmates, that they should not make false accusations – that they should not lie about things like that.  During this speech, Defendant Gregor appeared to be angry.

204.    After this, Ms. Hernandez did not trust Defendant Montoya and did not communicate with her again.

205.   Ms. Hernandez understood that Defendant Montoya was calling them liars, and she was embarrassed and uncomfortable.

206.   After Defendant Montoya's speech to his class, Defendant Gregor temporarily modified his behavior.  He stopped giving the girls gifts and candy, he gave the class a lot of work, and he stopped touching the girls, for a short period of time, maybe less than one week.

207.   However, once the abuse continued, it escalated.

208.    During the year, his touching went progressively higher up her leg and lasted longer, and he would have her – and the other girls – sit on his lap.

209.    The touching progressed until Defendant Gregor was touching Ms. Hernandez' vagina, inside her labia, rubbing her with his fingers.

210.    Defendant Gregor presumably did the same thing to the other girls that he did to Ms. Hernandez.

211.    Whenever Ms. Hernandez would get so uncomfortable that she wanted to act out, Defendant Gregor could tell, and he would whisper threats in her ear.  He would do the same thing to the other girls he abused.  This happened almost every day.

212.    Defendant Gregor called Ms. Hernandez on the telephone, once or sometimes twice a day, using her mother's cellular phone.

213.    Defendant Gregor came to her home, asked her mother if he could take Ms. Hernandez to the store with him and buy her a cellular phone of her own, and her mother said "yes."

214.    According Ms. Hernandez' mother, Defendant Gregor would call her daughter and speak to her for 15 or 20 minutes, while she would stand outside of her daughter's bedroom door and listen.

215.    Defendant Gregor told Ms. Hernandez (repeatedly), "I love you," and this made her uncomfortable.

216.    Later that school year, Defendant Gregor "borrowed" her phone from her and never gave it back.

217.    Defendant Gregor invited Ms. Hernandez to spend the night at his home, and he would ask her what she was going to wear.

33

218.    According to the mother of Ms. Hernandez, all of her daughters spent the night at Defendant Gregor's home twice.

219.    Ms. Hernandez slept over at his house all night, at least once, with her younger sisters, and observed Defendant Gregor (who did not have any children) had a room in his home decorated as if it was a little girl's room, with a girls' blanket on the bed, along with heart-shaped pillows and teddy bears, complete with a closet full of girls' toys.

220.    Ms. Hernandez remembers that Defendant Gregor sent his wife to bring Ms. Hernandez to him in his bedroom when she was there for the night with her sisters.  She remembers that he was wearing grey and blue striped pajamas, and that he told her to get into the bed with him.  She refused, telling him she had to sleep with her sisters or they would be afraid, and left the room.

221.    When Defendant Montoya was asked whether any parent complained about the fact that Defendant Gregor had Ms. Hernandez (and her sisters) stay at his house overnight, Defendant Montoya replied: "No. I saw the children there myself….It was one Saturday….They were there.  The children were there."

222.    Defendant Montoya took no action whatsoever upon observing the children, including Ms. Hernandez, at Defendant Gregor's home on the weekend.

223.    KS (described as Student B during the PED hearing) was first touched by Defendant Gregor, during her fourth-grade year in 2007-2008, after she became designated as the class secretary and was assigned the seat next to Defendant Gregor.

224.    Prior to that, she had been the president or the vice-president, but it was when she was designated secretary, in or near late September of 2007, that she had to sit right next to him, and he began to touch her.

225.    Defendant Gregor rotated the positions of his female students every month, from one officer to another, so the girl who was secretary would be seated next to Defendant Gregor for about one month, continuously.

226.    KS was the secretary three different times that year, or more, so sat next to Defendant Gregor for three entire months, or more.

227.    Defendant Gregor touched KS every single day that she was seated next to him.

228.    He touched both her legs, inside her thighs, and touched her vagina; he put his thumb or fingers inside her pants to touch her on her bare skin; he put his hand up her skirt (when she wore a skirt) to touch her on her bare skin; he kissed and licked her ear; and he would hold her hands.

229.    Once, when KS wore a skirt, and he put his hands up underneath it and pulled it up in order to touch her bare skin (apparently her inner thigh and vagina), she told him she did not want to be the secretary, or any other officer, any longer, but he forced her to stay seated where she was, because, he told her, there were no more desks in the classroom.

230.    On one occasion, Defendant Gregor kept KS inside the classroom with him when all the other students left for recess.

231.    Her friends told her, before they left, that they would be waiting by the two windows.

232.    Defendant Gregor whispered in KS's ear and licked or kissed it while he had her alone in his classroom.

233.    One of KS's friends, AL, ran into the classroom and said that the principal wanted to see KS.

234.    AL used this subterfuge in order to get KS out of the room.

35

235.   KS saw Defendant Gregor putting his thumb inside the pants of AL, under the table, the same way he put his thumb inside the pants of KS.

236.   Defendant Gregor touched KS in the manner she described, by her estimate, between 300 and 500 times during the 2007-2008 school year.

237.   KS was scared to tell her parents.  She was frightened by the way he touched her, and she was frightened by the way he reacted when she asked to be moved from the secretary position.

238.   Defendant Gregor punished KS when she asked to be moved by giving her a 'B' instead of an 'A' on a math test, marking a question wrong which she actually answered correctly, and which she knew she answered correctly.  She checked her answer with a friend, who had the same answer, and it was marked as correct.  When she tried to point it out to him, he told her she was wrong.

239.   Sometimes Defendant Gregor, when he had KS close to him, would put a large book up, balanced on its spine, so that nobody could see them behind the book, and then talk directly into her ear, which made her uncomfortable.

240.   KS does not recall going to the office with Plaintiff Jane Doe and the other girls, but she does recall that one of her friends went to Defendant Montoya's office during the 2007-2008 school year to report the touching.

241.   KS does not disagree with the recollections of Ms. Hernandez.  She herself has tried hard to forget much of what happened, and remembers hearing about the touching being reported as opposed to being part of the group reporting the touching.

242.   Defendant Montoya never called any of the girls identified as being inappropriately touched by Defendant Gregor into her office to ask them about these reports, nor did she take any other action to investigate the reports.

243.   Instead, Defendant Montoya came into Defendant Gregor's classroom and told the entire class that it was not good to lie, it could get people into serious trouble, and that whoever is saying that stuff about their teacher shouldn't be lying.  KS remembers this clearly, and reported it to her aunt some years later.

244.   On numerous occasions, Defendant Gregor asked KS to come over to his house to spend the night.  He would ask her this at least three or four times each week, and he would give her pens which had his name and telephone number on them.

245.   Defendant Gregor asked KS to sleep with him, asked her what she would wear to his house, and asked her what she wanted him to wear.

246.   KS never went to Defendant Gregor's house.

247.   KS's father came to eat lunch with her many times during the 2007-2008 school year.

248.   On one occasion, Defendant Gregor slid her chair away from him when her father walked into the classroom.  He also did that on one occasion when her mother walked into the classroom.

249.   Defendant Gregor gave KS gifts, including a large teddy bear holding a basketball, and coloring sets.

250.   Defendant Gregor's wife, Judith, was sometimes in his classroom.  One time she saw Defendant Gregor touch KS, on her inner thigh, and she patted Defendant Gregor on

the back and said something to him.  Defendant Gregor whispered something to her, and she began to cry.

251.    At some point during the 2007-2008 school year, the students in Defendant Gregor's class "purposely and strategically elected all boys as class officers."

252.    During lunch recess, the girls who had been victimized went to the boys in the class and asked them to elect all boys, and the boys went along with the plan.

253.    Defendant Gregor refused to honor that result, claiming it was not fair, that some girls had to be elected too, and held another election.

254.    There were times when the only class members elected as officers were girls, but Defendant Gregor never refused to honor those results.

255.    According to AL (described as Student C during the PED hearing) and her mother, AL's mother discovered Defendant Gregor was calling her daughter from a telephone with a long-distance (310) area code, on a daily basis, sometimes many times a day.

256.    Once AL's mother became aware of this, she would answer the telephone when Defendant Gregor called.

257.    Defendant Gregor offered to buy AL her own cellular telephone, but the mother of AL refused this offer.

258.    Also during that year, the mother of AL discovered that Defendant Gregor was giving her daughter gifts, such as candy, art supplies, teddy bears, and a large pillow book.

259.    At some point during that year, AL's mother became aware that Defendant Gregor had twice, to her knowledge, asked AL to spend the night at his home.

260.    During (or proximate to) April of 2008, AL came home crying.  Her mother asked her what was wrong and observed that AL was very scared.  She told her mother "she

had to tell [her] something, but that it was very ugly." After much persuasion, AL told her mother that Defendant Gregor had been touching her "in her private parts," and that he had been doing this for a long time.

261.   AL went on to tell her mother that Defendant Gregor was also touching her friends in class.

262.   That same day, AL's mother went to Defendant Montoya about this, reported all of the misconduct, including the gifts, the invitations, the telephone calls, and the touching, and told Defendant Montoya that she was going to go to the police.

263.   Defendant Montoya acknowledged that the mother of AL (Student C) reported to her, in April of 2008, "that Dr. G. [Defendant Gregor] had touched her [AL] in her private parts."

264.   According to the mother of AL, Defendant Montoya told her not to report Defendant Gregor's actions to the police because she, Defendant Montoya, would "take care of it."

265.   Defendant Montoya acknowledges that the mother of AL "said that if [Defendant Montoya] didn't do something about it, [the mother of AL] would go to the police."

266.   Defendant Montoya denies telling the mother of AL not to go to the police.

267.   At that time, nobody reported anything to the police, or to CYFD. Defendant Montoya did not report these allegations to CYFD, and neither did any other employee of Defendant EPS.

268.   Defendant Montoya told the mother of AL that other students had also complained that Defendant Gregor had touched them.

269.   Defendant Montoya told the mother of AL that she would report this to the Superintendent of Defendant EPS.

270.   Defendant Montoya took no action whatsoever with respect to these allegations, except, as described, apparently discussing them with Defendant Gregor, and telling the students not to make up stories about their teacher.

271.   AL remained in Defendant Gregor's class, but after her mother reported Defendant Gregor's misconduct to Defendant Montoya, Defendant Gregor never spoke to AL again.

## DEFENDANT GREGOR'S SEXUAL ABUSE OF PLAINTIFFS JANE DOE 2 AND JANE DOE 3

272.   During the 2008-2009 school year, Defendant Gregor taught fourth grade at Fairview Elementary School.

273.   Plaintiffs Jane Doe 2 and Jane Doe 3 were students in his class.

274.   Jane Doe 2 was often voted "President."

275.   During the periods of time that she served as "President," she sat next to Defendant Gregor.

276.   Defendant Gregor would keep Jane Doe 2 in the classroom during lunch, and he would close the door.

277.   Defendant Gregor had a lot of toys in a closet in his classroom, and he let her pick out whatever she wanted from his collection.

278.   Defendant Gregor would put his hand on Jane Doe 2's thigh, and he would keep it there.

279.   Jane Doe 2 remembers wearing a dress one day and experiencing Defendant Gregor putting his hand right up next to her vagina.

280.    Jane Doe 2 remembers that she tried to push him away, then got up and went to drink water to get away, at which point Defendant Gregor became angry with her.

281.    Defendant Gregor told her that she would no longer get any toys or treats.

282.    Defendant Gregor was mean and cold, and he would not allow her to go to the bathroom or to drink water.

283.    Jane Doe 2 stopped wearing dresses to school, even though she liked dresses and skirts better than pants.

284.    Jane Doe 2 would come home from school crying.

285.    Jane Doe 2's mother would ask her why she was always crying.

286.    Jane Doe 2 told her that her teacher, Defendant Gregor, was mean to her.

287.    Jane Doe 2's mother had heard rumors that she should not let her daughter stay alone with Defendant Gregor.

288.    She had heard rumors that he was taking girls into his classroom and closing the door.

289.    Jennifer Chavez spoke to Jane Doe 2's mother and told her that she had heard that Defendant Gregor wanted to have Jane Doe 2 come to his house, and that Jane Doe 2's mother should not allow this to happen.

290.    Jane Doe 2's mother went directly to Defendant Gregor to confront him, and he pretended that he could not understand her, despite the fact that they had been able to communicate with no trouble in the past.

291.    Jane Doe 2's mother then went to a secretary, who told her that it was not possible for her to get Jane Doe 2 out of Defendant Gregor's class.

292. Jane Doe 2's mother then went to Defendant Montoya, who told her the same thing – that Jane Doe 2 would have to stay in Defendant Gregor's class.

293. Jane Doe 2's mother told Defendant Montoya that she would take Jane Doe 2 out of that school then, and that is what she did.

294. Jane Doe 3 remembers that she was also elected "President" in Defendant Gregor's class that year.

295. Defendant Gregor would throw treats, like chocolate covered raisins, at the students in the class if they answered questions correctly.

296. During the various periods of time she was elected "President," Jane Doe 3 would sit in a chair with wheels on it, next to Defendant Gregor.

297. Jane Doe 3 remembers voting for other people, and knowing that other students would also vote for other people, but she would end up being elected.

298. Defendant Gregor asked Jane Doe 3 to stay in the classroom with him to help him "grade papers."

299. Defendant Gregor would ask Jane Doe 3 to sit on his lap.

300. Defendant Gregor would touch Jane Doe 3's hair.

301. Defendant Gregor would touch Jane Doe 3's thigh.

302. Defendant Gregor would put his hand on Jane Doe 3's knee and slowly move it up her thigh.

303. When he spoke to Jane Doe 3, he would get very close to her, so close that she could feel his breathe on her neck, and she felt uncomfortable.

304. Jane Doe 3 remembers Defendant Gregor's wife, Judith, coming to the classroom at times and sitting on the other side of the room, apparently grading papers.

305.    Jane Doe 3 remembers that she seemed very young and was small, and that Defendant Gregor, by contrast, seemed huge.

306.    Jane Doe 3 remembers Defendant Gregor's wife, Judith, would act as a substitute teacher in Defendant Gregor's class in his absence.

307.    Jane Doe 3's mother eventually got Jane Doe 3 taken out of Defendant Gregor's class and put into a different teacher's class at Fairview Elementary that year.

## DEFENDANT GREGOR'S ABUSE IS REPORTED TO LAW ENFORCEMENT

308.    During the 2008-2009 school year, the year after KS had left Defendant Gregor's class, one of KS's friends had a younger sister who was likely to be a student in Defendant Gregor's class in the upcoming school year.  KS was afraid that Defendant Gregor would do the same things to that girl that he had done to her.

309.    KS told her mother and father what had happened to her when she found out it was now happening to her friend's sister.

310.    KS's father filed a report with law enforcement on April 14, 2009, the day after KS informed him of what had happened to her.  He went to the police instead of the school because he did not want politics to get in the way of the investigation.

311.    Detective Bryan L. Martinez of the Espanola Police Department arranged for a Safehouse interview of KS on May 12, 2009, after which he reported the allegations against Defendant Gregor to Defendant EPS, through Assistant Superintendent Valdez and Superintendent Cockerham.

**P**OST-**R**EPORTING **B**EHAVIOR OF **D**EFENDANTS **M**ONTOYA, **S**UPERINTENDENT **C**OCKERHAM AND **EPS**

312.    Defendant Gregor was not placed on administrative leave by Defendant EPS until May 15, 2009.  Defendant EPS took no investigative action at that time, and made no report to the PED.

313.    According to Superintendent Cockerham, it would have been inappropriate for EPS to conduct an investigation into the allegations against Defendant Gregor, because the police "were the ones that had the expertise."

314.    According to Superintendent Cockerham, EPS employees had no duty to report suspected child abuse to the PED.

315.    Defendant Gregor continued to produce lesson plans and grade students' work while on administrative leave, on the directive of Superintendent Cockerham.

316.    Defendant Gregor's wife, Judith, was apparently allowed to serve as a substitute teacher in his classroom during this period.

317.    On January 12, 2010, Defendant Montoya signed the "Superintendent's Recommendation Form for Continuing Licensure" on behalf of Defendant Gregor.

318.    Superintendent (at the time) of Defendant EPS, Janette Archuleta, signed the same form on March 10, 2010, verifying Defendant Gregor's qualifications and recommending him for the renewal of his teaching license.

319.    Defendant Gregor filed an application for a renewal of his teaching license on May 27, 2010, with PED.

320.    In this application, he admitted that he had, in the past:

a.      An adverse action taken against any certificate of license in New Mexico or any other state;

b.      Been disciplined, reprimanded, suspended or discharged, from any employment because of allegations of misconduct;

c.      Resigned, entered into a settlement agreement, or otherwise left employment following an allegation of misconduct; and

d.      Been fingerprinted as a result of any arrest or detainment for any crime or violation of the law.

321.    Defendant Gregor attached an explanation to his application, stating that he was arrested in 1994 for 'inappropriate conduct' towards two girls and denying that any inappropriate conduct occurred, claiming the case was dismissed due to 'lack of evidence,' and that the girls' testimony before the Utah licensing agency 'showed deception.'

322.    Months after agreeing to recommend to the PED that it renew Defendant Gregor's license, Defendant EPS finally began its own investigation, in May of 2010, into the allegations of sexual abuse against Defendant Gregor for which Defendant EPS had placed him on administrative leave approximately one year prior.

323.    During that investigation, Defendant Montoya recalled:

a.      receiving a complaint from a parent about the manner in which Defendant Gregor restrained one of his female students on the playground during school year 2007-2008;

b.      hearing concerns that Defendant Gregor was having students sleep over at his house during the school year 2007-2008; and

c.      discussing with Defendant Gregor a complaint she had received concerning his inappropriate discussions with students in his classroom during the school year 2007-2008 about older men having young and multiple wives.

324.    During that investigation, Defendant Gregor stated that Defendant Montoya had "always been very supportive of him."

325.    With respect to his practice of having students sit at his desk next to him, he informed the investigator that "Ms. Montoya fully supports me."

326.    Defendant Montoya testified that she did not know why Defendant Gregor was placed on administrative leave in May of 2009.

327.    Rather than renewing Defendant Gregor's license, PED filed a Notice of Contemplated Action against Defendant Gregor in August of 2010, seeking to refuse to renew Defendant Gregor's license.

328.    PED ultimately prevailed, and Defendant Gregor's license to teach in New Mexico has never been renewed, although he has subsequently sought employment in other states as a teacher, luckily to no avail to date.

## COUNT I

### (Plaintiffs' Claims Against Defendant Gregor Under 42 U.S.C. § 1983)

329.    Plaintiffs incorporate all of the preceding paragraphs as if fully stated herein.

330.    Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 each have a right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

331.    Defendant Gregor deprived all three Plaintiffs of their substantive due process rights to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

332.    Defendant Gregor deprived Plaintiffs of their Fourteenth Amendment rights to substantive due process by physically, sexually, mentally, and emotionally abusing them, repeatedly.

333.    As a state actor, Defendant Gregor carried out, in an impermissible manner, the functions assigned to him by Defendant EPS.

334.    Defendant Gregor engaged in actions and omissions which were egregious, outrageous, or fraught with unreasonable risk.  Such actions harmed Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, who were each a member of a particular, limited, closed group, namely, female students at Fairview Elementary School.

335.    Defendant Gregor was not involved in a situation demanding split-second judgments.  Instead, Defendant Gregor had time for thoughtful deliberation.

336.    Defendant Gregor's conduct shocks the conscience.

337.    Defendant Gregor's conduct was a direct and proximate cause of each of the Plaintiffs' injuries and resultant damages.

338.    Defendant Gregor's conduct was intentional, reckless, willful, and done with callous disregard for each of the Plaintiffs' constitutional rights.  As Defendant Gregor's conduct was motivated by malice or evil intent, Plaintiffs are entitled to recover awards of punitive and exemplary damages against Defendant Gregor in an amount to be determined at trial.

339.    The constitutional rights of each of the Plaintiffs violated by Defendant Gregor were clearly established prior to Defendant Gregor's arrival in the State of New Mexico, and

any reasonable school administrator, teacher, or staff member would have been aware that the conduct described herein would violate Plaintiffs' constitutional rights.

## COUNT II

### (Plaintiffs' Claims Against Defendant EPS Under 42 U.S.C. §1983)

340.    Plaintiffs incorporate all of the preceding paragraphs as if fully stated herein.

341.    Defendant EPS had a duty to exercise due care in the supervision of its staff, teachers, and contractors.  In addition, Defendant EPS had a duty to properly screen, license, hire, train, monitor, supervise, and discipline staff, teachers, and contractors employed or licensed by Defendant.

342.    Defendant EPS failed to adequately screen Defendant Gregor prior to his licensing and employment, and failed to take necessary actions with respect to his licensure and employment during his tenure as a teacher, licensed and employed by Defendant EPS. Defendant EPS also failed to adequately train and supervise Defendant Gregor during his tenure as a teacher licensed and employed by Defendant EPS.

343.    These failures caused Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 to be subjected to the physical, sexual, mental, and emotional abuse described above.  Defendant EPS, because it knew or should have known of the predatory actions of Defendant Gregor prior to and during his employment with EPS, was deliberately indifferent to the constitutional rights of each of the three Plaintiffs as exemplified by its utter failure to protect Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, causing each Plaintiff to suffer injuries and resultant damages.

344.    The actions and deliberate omissions of Defendant EPS were the result of a custom or policy which permitted or condoned (reflecting deliberate indifference to Plaintiffs

Jane Doe 1, Jane Doe 2, Jane Doe 3, and to other female elementary school students) Defendant Gregor's physical, sexual, mental, and emotional abuse of each of the three Plaintiffs.

345.    As a consequence of Defendant EPS's defective licensing and hiring, defective supervision, and custom or policy, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, have been deprived under color of law of the rights, privileges, and immunities secured by the Constitution and the laws of the United States, including the right under the Fourteenth Amendment to be free from intrusions into their bodily integrity.

346.    As a direct and proximate consequence of the deprivation of their rights, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 each suffered the resultant injuries and damages described herein.

## COUNT III

**(Plaintiffs' Claims Against Defendant Montoya Under 42 U.S.C. § 1983)**

347.    Plaintiffs incorporate all of the preceding paragraphs as if fully stated herein.

348.    Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 each have a right to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

349.    Defendant Montoya deprived each of the three Plaintiffs of their substantive due process rights to bodily integrity under the Fourteenth Amendment to the U.S. Constitution.

350.    Defendant Montoya deprived each of the three Plaintiffs of their Fourteenth Amendment rights to substantive due process by purposefully protecting Defendant Gregor; by not taking action to stop his sexual abuse of female students after having actual knowledge of inappropriate behavior, both reported to her and actually observed by her; by condoning and ratifying Defendant Gregor's sexual abuse of his female students by reprimanding them (and their classmates) not to make up stories about Defendant Gregor after they reported the abuse;

and by failing to report Defendant Gregor's inappropriate conduct and sexual abuse of female students to law enforcement or to CYFD, thereby enabling Defendant Gregor to continue to sexually, physically, mentally and emotionally abuse female students, repeatedly, including Plaintiff Jane Doe, at Fairview Elementary School.

351.    As a state actor, Defendant Montoya carried out, in an impermissible manner, the functions assigned to her by Defendant EPS.

352.    Defendant Montoya engaged in actions and omissions which were egregious, outrageous, or fraught with unreasonable risk.  Such actions harmed Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, who were members of a particular, limited, closed group, namely, female students at Fairview Elementary School.

353.    Defendant Montoya was not involved in a situation demanding split-second judgments.  Instead, Defendant Montoya had time for thoughtful deliberation.

354.    Defendant Montoya's conduct shocks the conscience.

355.    Defendant Montoya's conduct was a direct and proximate cause of each of the three Plaintiffs' injuries and resultant damages.

356.    Defendant Montoya's conduct was intentional, reckless, willful, and done with callous disregard for each of the three Plaintiffs' constitutional rights.  As such, Plaintiffs are entitled to recover awards of punitive and exemplary damages against Defendant Montoya in an amount to be determined at trial.

357.    The constitutional rights of Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 violated by Defendant Montoya were clearly established prior to Defendant Gregor's arrival in the State of New Mexico, and any reasonable school administrator, teacher, or staff member

would have been aware that the conduct described herein would violate each of the three Plaintiffs' constitutional rights.

## COUNT IV

### (Plaintiffs' Claims Against Defendant EPS Under Title IX, 20 U.S.C. §§ 1681-1688, for Sexual Abuse)

358.    Plaintiffs incorporate all of the preceding paragraphs as if fully stated herein.

359.    At all times material hereto, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 were all students at Fairview Elementary School, owned, controlled, operated, and administered by Defendant EPS.

360.    The sexual abuse perpetrated by Defendant Gregor against each of the three Plaintiffs was so severe, pervasive, and objectively offensive that it deprived them of access to the educational opportunities or benefits provided by the school.

361.    Defendant EPS had actual or constructive knowledge that Defendant Gregor was sexually harassing and abusing female students, including Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3.

362.    Defendant EPS was deliberately indifferent to the inappropriate relationship and illegal conduct that Defendant Gregor imposed upon Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3.

363.    Defendant EPS had the authority and power to remedy the hostile environment facing Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, during the entire time frame in which they were subjected to Defendant Gregor's sexual abuse, but failed to do so.

364.    Defendant EPS did not provide adequate instruction or education to Fairview Elementary School students, faculty, or staff about sexual abuse, and did not enforce any

policies to prohibit or discourage the sexually abusive hostile environment facing Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 at the hands of Defendant Gregor.

365.   Defendant EPS acted with deliberate indifference and recklessness with respect to the sexually abusive hostile environment facing each of the three Plaintiffs.

366.   Upon information and belief, at all times material hereto, Defendant EPS received federal funding and financial assistance.

367.   Defendant EPS had a duty under Title IX, 20 U.S.C. § 1681, to provide an educational environment in which no student, including each of the three Plaintiffs, should be excluded from education, denied the benefits of education, or discriminated against on the basis of sex.

368.   At all times material hereto, Defendant EPS, acting through and as officials, administrators, and employees, maintained customs and policies which permitted or condoned sexual abuse of students by staff and teachers during school hours and school activities.

369.   As a result of these customs and policies, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 were subjected to invasive, severe, and objectively offensive sexual, physical, emotional, and mental abuse by Defendant Gregor during school hours and official school activities.  The sexual assaults and batteries upon each of the three Plaintiffs were the natural and inevitable consequence of effectively unsupervised classroom and on-campus activities.

370.   Defendant EPS failed to properly and adequately instruct administrators, supervisors, employees, and contractors as to how to respond to inappropriate behavior, including sexual abuse, by EPS employees toward students enrolled in Fairview Elementary School.  Defendant EPS did not develop or promulgate adequate policies addressing issues of sexual abuse by a teacher or staff member against a student or students.  The deliberate

indifference of Defendant EPS, and its officials, administrators, and employees, to the acts of sexual abuse, as well as its failure to adopt, publish, and inculcate appropriate policies concerning such abuse and harassment, deprived each of the three Plaintiffs of benefits under Title IX, and subjected them to discrimination on the basis of their sex, female, in violation of Title IX.  It further caused each of the three Plaintiffs to be excluded from participation in, denied the benefits of, and be subjected to discrimination on the basis of sex under an education program or activity receiving federal financial assistance.

371.    As a direct and proximate consequence of the discrimination and violation of Title IX, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 suffered the resultant injuries and damages described herein.

## COUNT V

### (Plaintiffs' Claims Against Defendants EPS and Montoya Under the New Mexico Tort Claims Act, NMSA 1978, § 41-4-6)

372.    Plaintiffs incorporate all of the preceding paragraphs as if fully stated herein.

373.    At all times material hereto, Defendant EPS operated Fairview Elementary School, which each of the three Plaintiffs attended, as well as other public schools in Espanola, while Defendant Montoya served as Principal of Fairview Elementary.

374.    Defendants EPS and Montoya, who was acting in the scope of her employment with Defendant EPS, had the duty in any activity actually undertaken to exercise for the safety of others, including each of the three Plaintiffs, that care ordinarily exercised by a reasonable, prudent, and qualified person in their position in light of the nature of what was being done.

375.    Defendant EPS had a duty to Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 and similarly-situated students to exercise reasonable care in the maintenance and operation of

Fairview Elementary School and the other Espanola public schools, and to keep all of their educational campuses and premises in a safe condition.

376.    Defendant Montoya likewise had a duty to Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 and similarly-situated students to exercise reasonable care in the maintenance and operation of Fairview Elementary School.

377.    Defendants EPS and Montoya had a further duty to supervise their employees, contractors, and agents to ensure that they did not act negligently in the operation or maintenance of their buildings.

378.    Supervision includes the obligation to adopt and inculcate reasonable and proper operational policies and procedures concerning the safe operation of Defendant EPS' educational facilities, including appropriate policies and procedures concerning employee training, adequate monitoring and regulation of their employee's activities, and other such policies and procedures as are reasonably necessary to ensure adequate safety in the operation and maintenance of Defendant EPS' educational facilities, such as Fairview Elementary School, in order to avoid unsafe, dangerous, or defective conditions on the premises.

379.    Defendants EPS and Montoya, in maintaining and operating the premises of Fairview Elementary in a safe condition, had a duty to supervise teachers and other employees and to protect minor students, including each of the three Plaintiffs, from sexual assaults, batteries, abuse, or harassment from other persons, including Defendant Gregor.

380.    Defendant EPS – acting through its administrators, supervisors, employees, and contractors – and Defendant Montoya had the duty to adopt and implement proper safety policies and procedures to protect its minor students, including each of the three Plaintiffs,

from sexual assaults, batteries, abuse, or harassment from other persons, including Defendant Gregor.

381.    Defendant EPS – acting through its administrators, supervisors, employees, and contractors – and Defendant Montoya had a duty to investigate and act upon any suspicions or reports of improper sexual assaults, batteries, abuse, or harassment by EPS employees or agents against any student attending Defendant EPS' schools.

382.    Defendants EPS and Montoya failed to exercise reasonable care in the maintenance of the premises in a safe condition, because they repeatedly ignored the warning signs and the readily observable (and reported) inappropriate behavior of Defendant Gregor toward female students, including Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3.

383.    Defendants EPS and Montoya failed to use ordinary care to protect each of the three Plaintiffs from the danger posed to them by Defendant Gregor.

384.    Defendants EPS and Montoya breached their duties of care towards each of the three Plaintiffs.

385.    Defendant EPS further breached its duties of care by failing to properly screen, hire, train, monitor, supervise and discipline employees of Fairview Elementary School, such as Defendant Gregor, as well as by failing to enact or enforce appropriate policies, procedures and protocols concerning safety in student-teacher interactions, and by otherwise failing to take appropriate and reasonable supervisory actions to correct the potential problems and prevent the harm and injuries incurred by Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3.

386.    Defendant EPS is jointly and severally liable for all injuries and damages caused each of the three Plaintiffs by the actions of its administrators and employees, including

Defendant Montoya and Defendant Gregor, pursuant to the doctrines of vicarious liability and *respondeat superior*.

387.    The above-described conduct of Defendants EPS and Montoya was a direct and proximate cause of the injuries to Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 and the resultant damages described herein.

## PRAYER FOR RELIEF

388.    Plaintiffs incorporate all of the preceding paragraphs as if fully stated herein.

389.    As a direct and proximate result of the wrongful and unlawful acts and omissions of all Defendants, as described above, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 were injured and have suffered and continue to suffer damages, including, but not limited to: physical injury, severe emotional distress, anguish, suffering, humiliation, psychological injuries, indignities, loss of enjoyment of life, deprivation of constitutional rights, invasion of bodily integrity, and other incidental, consequential, and special damages.

390.    As a result of the above-described damages and injuries, Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 are entitled to recover an award of full compensatory damages against all Defendants in amounts to be determined at the trial of this cause.

391.    Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 request damages in an amount sufficient to compensate them for all injuries and harm they suffered, as well as punitive damages as provided by law, along with costs of this action, pre- and post- judgment interest as provided by law, reasonable attorneys' fees as provided by law, and such other and further relief as proves just.

392.    Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3 request a trial by jury on all issues so triable.

Respectfully submitted,

ROTHSTEIN DONATELLI LLP

/s/ Carolyn M. "Cammie" Nichols 09/07/2017
CAROLYN M. "CAMMIE" NICHOLS
ALICIA C. LOPEZ
500 4th St., NW, Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443
cmnichols@rothsteinlaw.com
alopez@rothsteinlaw.com
*Attorneys for Plaintiff Jane Doe*